IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

KANYE WEST,

     Plaintiff,

v.                                                                          CIVIL ACTION NO. 2:20-CV-00570

MAC WARNER, in his Official Capacity as
Secretary of State of West Virginia,

     Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

       Plaintiff Kanye West ("Plaintiff" or "Mr. West"), by counsel, in his capacity as an independent candidate for President of the United States, respectfully moves this Court for the entry of an emergency preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendant West Virginia Secretary of State Mac Warner ("Defendant" or "Defendant Secretary of State") from enforcing the State's ballot access law, W.Va. Code § 3-5-23, as applied to Plaintiff, and placing Mr. West and his running mate, Ms. Michelle Tidball, on the 2020 General Election Presidential ballot as independent candidates for President and Vice President, respectively.  As set forth in greater detail below, and in the corresponding Complaint that Plaintiff has filed simultaneously with this Memorandum and Motion, such emergency relief is warranted to prevent irreparable harm to both the Plaintiff and other West Virginia voters' rights under the First and Fourteenth Amendments of the United States Constitution.

## STATEMENT OF FACTS

       On July 4, 2020, Plaintiff announced his intention to campaign for President of the United States.  As part of that campaign, Plaintiff embarked on the myriad of signature collection processes required to gain ballot access as an independent candidate in many states.  Under West

Virginia law, candidates with no party organization may be nominated to the General Election ballot through the certificate nomination process set forth in W.Va. Code §§ 3-5-23 and 3-5-24. More specifically, independent candidates and their campaigns must solicit signatures from duly qualified voters in order to qualify for the general election ballot.  W.Va. Code § 3-5-23(b).  The number of signatures required to gain access to the ballot must be equal to not less than 1% of the entire vote cast in the last preceding general election for President of the United States, which in this case comes to 7,144 signatures.[1]  W.Va. Code § 3-5-23(c).  In order to qualify for the General Election ballot in West Virginia, Plaintiff was required to submit all 7,144 nominating certificates to the West Virginia Secretary of State's office by August 3, 2020.[2]  *See* W.Va. Code § 3-5-24(a).

To the extent practicable, Plaintiff has complied with all of the steps necessary to be placed on the General Election ballot pursuant to W.Va. Code §§ 3-5-23 and 3-5-24.  Plaintiff's campaign obtained the credentials necessary to collect signatures in the various counties, as required by W.Va. Code § 3-5-23(b), and Plaintiff's designees solicited signatures from duly registered voters in the following counties: Boone, Cabell, Clay, Fayette, Hancock, Jackson, Jefferson, Kanawha, Lincoln, Logan, Marion, Marshall, Mason, Mingo, Mercer, Monongalia, Nicholas, Ohio, Pleasants, Putnam, Raleigh, Roane, and Wayne.  Plaintiff's campaign conducted its signature gathering process in the midst of Governor Jim Justice's ongoing "Safer at Home" Order, which strongly encourages West Virginians to leave their home "only for essential activities," limits social gatherings to no more than 25 people, and strongly encourages social distancing of six feet or more.[3]  While Governor Justice and Defendant Secretary of State made

---

[1] *See* West Virginia Secretary of State's 2020 Election Petition Signature Requirements, *available at* https://sos.wv.gov/FormSearch/Elections/Informational/Signatures%20Chart.pdf.

[2] Because the statutorily imposed deadline of August 1 occurred on a Saturday this year, the deadline for submission of nominating certificates defaulted to Monday, August 3, in accordance with W.Va. Code § 2-2-1(f).

[3] *See* Safer at Home Order, available at https://governor.wv.gov/Pages/Safer-at-Home.aspx.

accommodations for those participating in the 2020 Primary Election, such as moving the primary election date and providing absentee ballot forms for all registered voters, [4] no such accommodations have been made for individuals with no party organization wishing to avail themselves of the ballot access process provided for by W.Va. Code § 3-5-23.[5]

In sum, Plaintiff submitted more than 14,000 signatures, or nomination certificates, to the West Virginia Secretary of State on August 3, 2020, along with his corresponding Certificate of Announcement and filing fee. *See* W.Va. Code §§ 3-5-7 and 3-5-8. Following the Plaintiff's submission of the requisite nominating certificates, signature petition pages are provided by Defendant Secretary of State to each county clerk to confirm that the voters are duly registered to vote in the particular county and that the petition signatures match each voter's signature on file with the County Clerk's Office. *See* Exhibit A. While W.Va. Code § 3-5-23(c) provides that a signature "may not be counted unless it be that of a duly registered voter," Plaintiff is aware of no standards provided to the various county clerks for validating petition signatures. There is no legislative rule governing the certificate nomination process, nor is there any opportunity for Plaintiff or other similarly situated candidates to challenge the invalidation of any petition signatures or otherwise cure once the statutory deadline for submission has passed.

Nearly three weeks following the submission of his nomination certificates, Defendant Secretary of State notified Plaintiff that more than 7,000 of his petition signatures had been invalidated by the various county clerks, leaving him with a total of 6,383 valid petition

---

[4]   *See* W.Va. Exec Order No. 18-20 (April 1, 2020), https://governor.wv.gov/Documents/2020%20Proclamations/EO%2018-20.pdf; *see also* "1.2 million absentee ballot applications sent to West Virginia voters," MetroNews, April 19, 2020, available at https://wvmetronews.com/2020/04/19/1-2-million-absentee-ballot-applications-sent-to-west-virginia-voters/.

[5] West Virginia's ballot access provisions remain unaltered despite Defendant Secretary of State's prior recommendation for a 50% reduction in signatures required for all non-major party candidates seeking ballot access pursuant to W.Va. Code § 3-5-23. *See* Memorandum from WV Secretary of State's General Counsel to Governor's Office Legal Division, attached hereto as Exhibit A.

signatures—761 signatures shy of the 7,144 signature requirement to gain access to the ballot.  Of note, Defendant Secretary of State reported 3,222 valid signatures from Kanawha County and 983 valid signatures from Monongalia County.  *See* WV Secretary of State Validation Totals, attached hereto as Exhibit B.  Based on its own review of the nomination certificates submitted to Defendant Secretary of State, Plaintiff's campaign has identified at least 700 duly registered voters on its Kanawha County certificates that have not been validated, as well as another 110 from Monongalia County.  *See* Verified Statement of Michael Rhodes at ¶ ¶ 11-12, attached hereto as Exhibit C.  The validation of these registered voters would give Plaintiff more than enough signatures to qualify for the 2020 General Election Ballot.

Upon information and belief, Defendant Secretary of State provided notice the afternoon of August 21, 2020, to all 55 county clerks of the names duly qualified for the 2020 General Election ballot.  Pursuant to W.Va. Code § 3-6-2(d)(2), the statutorily required drawing for order of names appearing on the General Election ballot took place four days later on August 25, 2020, and Plaintiff's lawsuit challenge to these designations followed suit just three days later.[6]  Notably, Plaintiff's Complaint and corresponding Motion for Preliminary Injunction are filed well in advance of the next statutory deadline for the 2020 General Election, which is the September 18th deadline for County Clerks to mail absentee ballots pursuant to W.Va. Code § 3-3-11(a).  In West Virginia, it is also not unprecedented for courts to order candidates be added to the ballot after the printing of such ballots has taken place.[7]

---

[6] Importantly, Plaintiff has not slept on his rights, as his Complaint was filed within one week of the arbitrary and capricious invalidation of his nomination certificates on August 21, 2020, from which denial the bulk of his claims arise.

[7] *See State ex rel. McDavid v. Tennant,* 2014 WL 2922641 (2014) (in which the West Virginia Supreme Court ordered the West Virginia Secretary of State's placement of a candidate on the ballot even after military and overseas ballots had been printed and mailed).

## ARGUMENT

**I.      Legal Standard and Standard of Review**

"Rule 65 of the Federal Rules of Civil Procedure provides for the issuance of preliminary injunctions as a means of preventing harm to one or more of the parties before the court can fully adjudicate the claims in dispute." *Fred Hutchinson Cancer Research Ctr. v. BioPet Vet Lab, Inc.*, 768 F. Supp.2d 872, 874 (E.D. Va. 2011).   "A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geran*, 553 U.S. 674, 689-90 (2008)).   "All four elements must be established by a 'clear showing' before the injunction will issue." *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp.2d 862, 868 (S.D. W. Va. 2014) (internal quotations omitted).   Additionally, the plaintiff bears the burden of showing a "sufficient factual basis" for granting the injunction "beyond the unverified allegations in the pleadings." *Id.* at 868-69 (internal citations omitted).   A plaintiff does not have to prove his or her case on the merits in order to succeed on a motion for preliminary injunction, and the findings of fact and conclusions of law made during the consideration of a preliminary injunction are not binding at a trial on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

When evaluating the constitutionality of ballot access laws, such as the one in question here, courts typically apply the framework established by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and later refined by the Court in *Burdick v. Takushi*, 504 U.S. 428 (1992).  *See Whitfield v. Thurston,* --- F.Supp.3d ---, 2020 WL 3451692, at *9 (E.D. Ark. 2020).  Under the *Anderson-Burdick* framework, a Court considering a challenge to state election laws must employ a balancing test to:

> weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789).

Under the *Anderson-Burdick* framework, this Court must first determine the burden that W.Va. § Code 3-5-23 imposes on Plaintiff's First and Fourteenth Amendment rights. *See Esshaki v. Whitmer,* --- F.Supp.3d ----, 2020 WL 1910154, at *4 (E.D.Mich. March 20, 2020). When a plaintiff's rights are subject to "severe" restrictions, ballot access laws will be subject to strict scrutiny and "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick,* 504 U.S. at 434 (quoting *Norman v. Reed,* 502 U.S. 279, 289 (1992)). Rights subjected to "reasonable, nondiscriminatory restrictions" are subject to rational-basis review. *Id.* And "[f]or cases between these extremes," a court must apply an intermediate level of scrutiny which requires the weighing of the burden imposed by the ballot access law against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick,* 504 U.S. at 434.[8]

For the reasons set forth herein, the issuance of a preliminary injunction is warranted. Plaintiff is likely to succeed on his claims as the burden that W.Va. Code 3-5-23 currently places on his constitutional rights to associate for advancement of his political beliefs, his right to petition for redress of grievances, and his right to equal protection and due process

---

[8] At a minimum, the application of intermediate scrutiny is warranted in the case at hand, as even Defendant Secretary of State acknowledges that the signature-gathering process set forth in W.Va. Code § 3-5-23 "presents a health risk to solicited voters" during the ongoing pandemic and thus "creates a larger than typical burden on these candidates to satisfy the law under the circumstances." *See* Exhibit A.

under the laws are severe.  W.Va. Code § 3-5-23 also unduly burdens the rights of qualified voters in West Virginia, including those who signed nomination certificates for Plaintiff, to cast their votes effectively.  In the absence of a preliminary injunction, Plaintiff will clearly suffer irreparable harm as he will be left off the 2020 General Election ballot.  The balance of equities also tips in favor of Plaintiff as the harm to Plaintiff's constitutional rights ultimately outweighs the burden on Defendant Secretary of State to apply West Virginia's ballot access provisions in a constitutional manner. And finally, an injunction is clearly in the public interest as duly registered voters deserve the opportunity to cast a ballot for the candidate of their choice.

## II.     Plaintiff is likely to succeed on his claims.

Plaintiff's claims against Defendant arise under 42 U.S.C. § 1983 ("Section 1983"). "To state a claim under [S]ection 1983, a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988). As shown below, Plaintiff is likely to succeed on the merits of his Section 1983 claims because Defendant violated Plaintiff's Fourteenth Amendment rights to procedural due process and equal protection under the law, as well as Plaintiff's First Amendment right to freedom of association.

### A.     Defendant's failure to provide adequate notice, a right to be heard, and an ability to cure any alleged deficiencies in Plaintiff's nomination certificates violates Plaintiff's right to procedural due process.

This Court should grant Plaintiff's Motion because Defendant failed to provide Plaintiff with any procedural due process whatsoever before deciding not to certify Plaintiff's certificate nomination, which precluded Plaintiff from appearing on West Virginia's 2020 General Election ballot as an independent candidate for President.  As previously discussed, West Virginia Code § 3-5-23 dictates how third parties can qualify to appear on the ballot through the certificate

nomination process.  Relevant for purposes of this Motion, West Virginia Code § 3-5-23 states as follows:

> The certificate shall be personally signed by duly registered voters, in their own proper handwriting or by their marks duly witnessed, who must be residents within the county, district, or other political division represented by the office sought wherein the canvass or solicitation is made by the person or persons duly authorized…. A signature on a certificate may not be counted unless it be that of a duly registered voter of the county, district, or other political division represented by the office sought wherein the certificate was presented.

W. Va. Code § 3-5-23(c).

Notably, West Virginia Code § 3-5-23 does not provide *any* procedural safeguards that would permit a third-party candidate to challenge the county clerks' counting and assessment of the validity of signatures in a third-party certificate nomination, nor does it provide any procedural safeguard to challenge Defendant Secretary of State's refusal to certify a third-party certificate nomination for West Virginia's General Election ballot based upon the non-counting of purportedly mismatching voter signatures.  Additionally, Defendant Secretary of State does not have any regulations, administrative guidelines, or training that would provide the county clerks throughout West Virginia, who are laypersons in the field of handwriting analysis, with any guidance on how to distinguish invalid signatures on a nomination certificate from valid signatures.[9]  As a result, there is a significant discrepancy between the number of signatures validated by Plaintiff's campaign and the number of signatures validated by the various county clerks—a discrepancy that bars Plaintiff's access to the ballot.  *See* Exhibit C at ¶¶ 11-12.

---

[9] By way of comparison, the Montana Secretary of State, for instance, provides a sixty-page guideline for petition processing as part of its "2020 Election Administrator Certification Training."  *See* "Petition Processing in MT Votes," available at https://sosmt.gov/Portals/142/Elections/Documents/Petition-Processing.pdf.

In recent months, as absentee voting expands throughout the country in response to the ongoing COVID-19 pandemic, courts have begun to strike down so-called signature-matching laws that do not provide sufficient procedural safeguards, including, at a minimum, a sufficient notice period for alleged invalid signatures as well as a sufficient period of time to be heard and to "cure" alleged invalidities.[10]  Otherwise, those signature-matching laws do not comport with the Fourteenth Amendment's procedural due process requirements.[11]

In order to determine the level of due process required, courts utilize the following balancing test enunciated by the United States Supreme Court of Appeals in *Mathews. v. Eldridge*, which, in relevant part, holds as follows:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.[12]

First, in this case, the private interest affected by Defendant's decision to not certify Plaintiff's certificate nomination permitting Plaintiff to appear on West Virginia's 2020 General Election ballot as an independent candidate for President is an extraordinarily important interest that implicates not only Plaintiff, individually, and Plaintiff's campaign, but also those duly registered West Virginia citizens that exercised their statutory rights to petition for Plaintiff to appear on West Virginia's General Election ballot.  It is important to note that the West Virginia

---

[10] With a legitimate opportunity to cure, Plaintiff could have determined why his nomination certificates contain more than eight hundred identified duly registered voters in West Virginia whose signatures were not validated by the various county clerks.  *See* Exhibit C at ¶¶ 11-12.

[11] The Fourteenth Amendment forbids a state actor to "deprive any person of life, liberty, or property, without due process of law."  US CONST. amend. XIV, § 1.

[12] Plaintiff facially challenges the lack of due process afforded to Plaintiff under West Virginia Code § 3-5-23, *et seq.*  Additionally, Mr. West challenges West Virginia Code § 3-5-23, *et seq.* as it applies to him specifically.

Legislature, through West Virginia Code § 3-5-23, created a statutory scheme for third-party candidates to be placed on West Virginia's general election ballot through the certificate nomination process.  *See* W. VA. CODE § 3-5-23(a).  As such, West Virginia Code § 3-5-23, *et seq*. grants Plaintiff a liberty interest in that the Legislature specifically created a statutory process by which a third-party candidate can seek a nomination for political office through the certificate nomination process.  *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Becton v. Thomas*, 48 F. Supp. 2d 747, 757 (W.D. Tenn. 1999) ("Plaintiff's right to run for public office is constitutionally protected as a liberty interest under the Fourteenth Amendment's due process clause."); *Johnson v. Roy*, 2012 WL 3923308, at *7 (Minn. Dist. Ct. 2012) ("A state statute may create liberty interests that are entitled to constitutional procedural protection.").

Second, it cannot be disputed that the lack of *any* procedural safeguards whatsoever surrounding West Virginia Code § 3-5-23's signature-matching requirement has already created a situation wherein Plaintiff faces imminent deprivation of his liberty interests without any adequate notice from Defendant Secretary of State, without a chance to be heard or appeal the decision made by the West Virginia Secretary of State, and without an ability to cure any alleged deficiencies in Plaintiff's certificate nomination paperwork prior to Defendant Secretary of State choosing not to certify Plaintiff's candidacy for President.  West Virginia provides procedural due process for driver's license revocation, workers' compensation appeals, and even disciplinary proceedings in state-funded universities, to name a few, and yet its current ballot access framework does not provide one iota of procedural due process for independent candidates seeking ballot access.[13] Clearly, West Virginia Code § 3-5-23 does not come anywhere close to satisfying Plaintiff's

---

[13] *See* W.Va. Code § 17C-5A-1, *et seq.*; *see also* W.Va. Code § 23-5-6; *see also* W.Va. Code § 21A-7-7.

constitutional requirement of procedural due process prior to the denial of his ability to run for elected office. [14]

A vast majority, if not all, of federal courts to recently consider nearly analogous issues of law and fact hold that a state's failure to provide adequate notice of allegedly deficient signatures coupled with an opportunity to be heard and "cure" the allegedly deficient signatures constitutes a prima facie showing of a constitutionally inadequate process for purposes of the Fourteenth Amendment's due process clause. For instance, in the following cases, federal district courts have struck down signature-matching laws for lacking sufficient procedural safeguards required under the due process clause.

Just a few days ago, the United States District Court for the Southern District of Indiana, in *Frederick v. Lawson*, granted summary judgment in plaintiffs' favor on the basis that Indiana's signature-match requirement for absentee ballots failed to comport with procedural due process requirements mandated by the Fourteenth Amendment. *Frederick v. Lawson*, --- F. Supp.3d ---, 2020 WL 4882696, *16 (S.D. Ind. Aug. 20, 2020). In *Frederick*, the Court considered expert testimony from a renowned handwriting analysis expert who opined that laypersons administering the election ***could not accurately assess*** whether a voter's signature on the absentee ballot "matched" the voter's signature on their voter registration. *Id.* at *14-15. The Indiana signature-match law did not contain any "procedure by which a voter can contest the decision that two signatures do not match, nor [did it contain] a requirement that a formal notice of protection be sent to the voter at any point after election day." *Id.* at *3. The only guidance given by the State of Indiana to election officials reviewing voter signatures for conformity was that "[s]ome

---

[14] Again, the significance of this lack of procedural due process is highlighted by the fact that Plaintiff's campaign has identified more than eight hundred nomination certificate signatures that have not been counted by the county clerks for one reason or another. *See* Exhibit C at ¶¶ 11-12.

deference" should be given to determining the genuineness of voters having known disabilities. *Id.* at *14. The *Frederick* court found that procedural safeguards contained in Indiana's signature-matching law did not come anywhere close to comporting with the procedural due process requirements of the Fourteenth Amendment. *Id.*

In *Saucedo v. Gardner*, the United States District Court for the District of New Hampshire similarly granted plaintiffs' motion for summary judgment, holding that New Hampshire's signature-match law for absentee ballots was unconstitutional on its face as the law failed to provide sufficient procedural due process under the Fourteenth Amendment. *Saucedo v. Gardner*, 335 F. Supp.3d 202, 222 (D. NH. 2018). In so holding, the *Saucedo* Court focused on the plaintiffs' handwriting expert, who opined, among other things, "that a person's signature may vary for a variety of reasons, both intentional and unintentional [with] unintentional factors includ[ing] age, physical and mental condition, disability, stress, accidental occurrences, inherent variances in neuromuscular coordination, and stance." *Id.* at 212-13. The expert further opined that "in order to account for these variations and make an accurate determination, one needs extensive training, adequate magnification and lighting equipment, sufficient time . . . [and a requisite] number of exemplars necessary to make a proper determination." *Id.* at 212. After reviewing the expert testimony, the *Saucedo* Court acknowledged that "***the task of handwriting analysis by laypersons***, as it is contemplated under RSA 659:50, III, ***is fraught with error***." *Id.* at 217 (emphasis added). In holding that the signature-match requirement did not comport with procedural due process, the Court emphasized that the consequences of invalidating an absentee ballot on the basis of the signature-matching requirement resulted in "disenfranchisement" which is "irremediable." *Id.* at 218.[15]

---

[15] The Court also heavily relied on several other judicial opinions in concluding that the signature-matching requirement did not comport with procedural due process. *See, e.g.*, *La Follete v. Padilla*, 2018 WL 3953766 (Cal.

In *Martin v. Kemp*, the United States District Court for the Northern District of Georgia also enjoined the State of Georgia from rejecting absentee ballots on the basis of a signature mismatch due to a lack of adequate procedural due process safeguards. *Martin v. Kemp*, 341 F. Supp.3d 1326, 1340 (N.D. Ga. 2018). The *Martin* Court found that Georgia's relevant signature-matching provision was facially unconstitutional because it permitted voters' absentee ballot applications and absentee ballots to be erroneously rejected without sufficient procedural safeguards in place to prevent erroneous disenfranchisement of voters who purportedly had mismatching signatures. *Id.* at 1337-40.[16] In so holding, the *Martin* court found it constitutionally deficient that laypeople with no training or education in handwriting analysis would be the judge, jury, and executioner on determining whether a voter's signature on the absentee ballot matched the voter's signature on the voter roll. *Id.*[17]

The procedural due process concerns raised in absentee ballot cases similarly apply to West Virginia's ballot access law, as the process of validating nomination certificates impacts

---

Super. Ct. march 5, 2018) (concluding that provision of California Election Code, which required election officials to reject a ballot if the signatures did not "compare," was facially unconstitutional because it failed to provide pre-deprivation notice or an opportunity to cure); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990) (concluding that Arizona absentee-voting statute, which failed to provide absentee voters with any post-deprivation notice or opportunity to be heard when their votes were challenged and rejected, did not afford adequate procedural due process); *Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. March 13, 2006) (holding signature-matching law unconstitutional on procedural due process grounds, even when voters with mismatching signature were provided notice of the discrepancy, because it did not provide a meaningful opportunity to cure the defect).

[16] The defendants in *Martin* argued that additional procedural safeguards to give notice and a chance for mismatched signature voters to cure their absentee ballot would be unduly burdensome. *Id.* at 1339-40. However, the Court found that Georgia already had statutory procedures that "provide[] notice, a hearing, and an opportunity to appeal for absentee voters whose ballots are challenged for ineligibility." *Id.* at 1340. As such, the Court held that to extend those statutory procedural safeguards to cover absentee ballots with mismatched signatures would "impose a minimal burden" on the State while still protecting the State's legitimate interest in preventing election fraud. *Id.*

[17] For sake of brevity, only a few of the recent decisions have been illustrated in the Memorandum of Law in Support of Plaintiff's Motion. That said, there are a whole host of recent cases that have similar analyses and holdings. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp.3d 1017, 1030 (N.D. Fla. 2018) ("The only way such a [scheme of laypersons validating handwritten signatures] can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions by canvassing boards to reject ballots based on signature mismatches.").

the constitutional rights of both Plaintiff and West Virginia voters supporting his placement on the General Election ballot.  In this case, Defendant Secretary of State, and the corresponding county clerks, timely received all of Plaintiff's required nomination certificates on August 3, 2020, and spent approximately three weeks analyzing the same before advising Plaintiff's campaign that he would not appear on the 2020 Presidential General Election ballot because more than half of the submitted nomination certificates were deemed invalid by the various county clerks under West Virginia Code § 3-5-23.  Just four days later, on August 25, 2020, the statutorily-required drawing for order of names to appear on the General Election ballot took place and excluded Plaintiff.  In denying Plaintiff's certificate nomination, Defendant Secretary of State *never* provided Plaintiff an opportunity to be heard or otherwise challenge the signature determinations, nor was Plaintiff, or the duly registered West Virginia citizens supporting his nomination, given the chance to cure any perceived defects in the nomination certificates.  To the contrary, Plaintiff was not even provided evidence of those signatures that had been invalidated so that his campaign could perform its own independent analysis.

    In complying with West Virginia Code § 3-5-23, Plaintiff's campaign spent tremendous time and resources throughout the State of West Virginia to acquire nearly double the amount of certificate nomination signatures required by statute in order to appear on the 2020 General Election ballot as an independent candidate for President.  Similar to the circumstances of the recent cases cited above, Plaintiff has been stripped of his liberty interest to appear on the 2020 General Election ballot without adequate notice, without any opportunity whatsoever to challenge the decision and underlying processes that led to that decision, and without any chance to cure the purported invalidities in the certificate nomination.

Neither West Virginia Code § 3-5-23 nor related election law provisions provide any guidance on how nomination certificate signatures should be assessed for validity.[18] Additionally, upon information and belief, Defendant Secretary of State does not provide any formalized administrative guidance to the various county clerks on how to assess signatures for validity.  While the cases cited above largely deal with absentee ballots, the same premise applies to the certificate nomination process.   West Virginia Code § 3-5-23 provides independent candidates an opportunity to avail themselves of the political process.   Without any sort of guidance, training, or experience, the various county clerks wield the extraordinary power to make a non-appealable determination as to whether parties availing themselves of West Virginia Code § 3-5-23 complied with the statute by making ad-hoc determinations on, among other things, whether a voter's signature on the nomination certificate matches the voter's signature stored in the voter rolls.  As courts throughout the country have recently held, laypersons making non-appealable determinations on signature matching, which requires expert analysis in order to accurately assess, violate a party's liberty interest without sufficient procedural due process.

Finally, if this Court were to grant Plaintiff's Motion and enjoin Defendant from enforcing W.Va. Code § 3-5-23 as applied to Plaintiff, it would not create any substantial fiscal or administrative burdens for the county clerks or Defendant Secretary of State.  For one, most candidates running for office do not avail themselves of the certificate nomination process set forth in West Virginia Code § 3-5-23.  As such, the number of persons running for elected office using the nomination certificate process and the number of petitioners certifying the nomination will not be substantial.  To the extent that a party seeking ballot access pursuant to W.Va. Code § 3-5-23

---

[18] West Virginia Code § 3-1-46 contemplates "audio-visual" training for election officials to occur once every two years, but the training only pertains to "the procedures for conducting elections, the duties of the various election officials[,] and the methods of voting on each voting system in use in the state."  W. VA. CODE § 3-1-46.  This sort of training could not turn a layperson into a handwriting analysis expert.

challenged the determination of signature validations, any potential recount or further look into the challenged nomination certificates' signatures would be spread across the various county clerks.[19]

Furthermore, state law already provides some level of challenge and appeal process with respect to ballot signatures. Specifically, W.Va. Code § 3-1-41—entitled "Challenged and Provisional Voter Procedures"—sets forth a detailed statutory scheme whereby a voter can challenge a determination by the receiving canvassing board that "the signature written by the person in the poll book does not correspond with the signature purported to be his or hers on the registration card." W. VA. CODE § 3-1-41(a)(2). As such, it would take very little additional fiscal or administrative responsibility to provide independent candidates, and their petitioners, with an opportunity to be heard and challenge any signature invalidations in the certificate nomination process.[20] Accordingly, because Plaintiff's deprivation of his liberty interest in this case is fundamental, and because Defendant would not otherwise incur undue administrative or fiscal burdens in providing the procedural due process safeguards required to nominees and petitioners availing themselves of W.Va. Code § 3-5-23, this Court should grant Plaintiff's Motion and enjoin Defendant Secretary of State from enforcing the State's ballot access law as applied to the Plaintiff, as it fails to afford him the procedural due process required by the Fourteenth Amendment.

---

[19] In fact, many candidates availing themselves of the ballot access procedures of W.Va. Code § 3-5-23 are not statewide candidates and would require the validation of relatively few numbers of signatures. To counsel's knowledge, Plaintiff is the only "statewide" candidate to successfully submit more than the requisite number of petition signatures to access the 2020 General Election ballot.

[20] Other courts considering the issue of burden on state election officials to provide procedural safeguards have held that it is not unduly burdensome for state election officials to extend the provisional ballot challenge process to other voter challenges, including mismatching signature determinations. *See, e.g.*, *Frederick*, 2020 WL at *15 ("[W]e find that instituting a process similar to the provisional ballot procedures currently employed by election authorities . . . would not pose an undue administrative and fiscal burden on election authorities such that it would outweigh mail-in absentee voters' interest in protecting their votes[.]").

**B.**     **W.Va. Code § 3-5-23 violates the Equal Protection Clause contained in Fourteenth Amendment of the United States Constitution.**

While Plaintiff can affirmatively show that he is likely to succeed on the merits on his procedural due process claim, West Virginia Code § 3-5-23 also violates Plaintiff's Fourteenth Amendment constitutional right to equal protection under the law.  Federal courts assess equal protection claims challenging state election laws under the aforementioned *Anderson-Burdick* standard.  *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789.  Under the *Anderson-Burdick* test, a court must:

> weigh the character and magnitude of the asserted injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id.*  "Under this standard, the level of scrutiny applied to the challenged restriction depends on the extent of its imposition: the more severely it burdens constitutional rights, the more rigorous the inquiry into its justification."  *Frederick*, 2020 WL 4882696, *16 (S.D. Ind. Aug. 20, 2020).

In this case, Mr. West, despite the late announcement of his campaign on July 4, 2020, substantially complied with all provisions of West Virginia Code § 3-5-23 in order to appear on the 2020 General Election ballot as an independent candidate for President of the United States. The injury that Plaintiff asserts against Defendant is a significant injury to his fundamental rights— the deprivation of his right to appear on West Virginia's General Election ballot as an independent candidate for President of the United States without adequate notice or an opportunity to cure based on determinations made by layperson county clerks with no knowledge, training, or skill in handwriting analysis.  While Plaintiff does not possess a fundamental right to actually be elected to office, he does possess "a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualification.  The State may not deny to some the

17

privilege of holding public office that it extends to others[.]" *Turner v. Fouche*, 396 U.S. 346, 362-63; *see also Lubin v. Panish*, 415 U.S. 957 (1974) (holding that candidates for political office possess an "important interest in the continued availability of political opportunity.").

Defendant Secretary of State will likely argue that its interest in enforcing West Virginia Code § 3-5-23 is to prevent election fraud and to maintain accurate election records. While these goals are no doubt important, the arbitrary and capricious nature of laypersons determining whether handwritten signatures are valid, coupled with no procedural due process for those affected by such a determination, actually cuts against the State's legitimate interest in preventing election fraud and maintaining accurate records. *See, e.g.*, *Frederick*, 2020 WL at *17 ("In fact, without such procedural safeguards, the signature verification requirement actually threatens to undermine the State's interests in correctly validating the identity of voters[.]").[21]

An application of *Anderson-Burdick* standard to the facts of this case clearly shows that Plaintiff's fundamental interest in appearing on the West Virginia General Election ballot vastly outweighs any legitimate state interest that West Virginia Code § 3-5-23 is meant to protect—especially considering that Plaintiff complied with the statutory requirements set forth in West Virginia Code § 3-5-23.  As mentioned above, the ad-hoc application of West Virginia Code § 3-5-23 by laypersons determining the validity of signatures significantly cuts against the State's legitimate interests in accurately maintaining election records and preventing election fraud.  As such, because the State's interests are not furthered by the current application of West Virginia Code § 3-5-23, and because depriving Plaintiff from appearing on the General Election ballot

---

[21] *See, e.g.*, *Self Advocacy Solutions N.D. v. Jaeger*, --- F. Supp.3d ---, 2020 WL 2951012, *10 (June 3, 2020) (holding that State's interests did not outweigh the interest of absentee voters not afforded sufficient procedural due process to challenge ballot determination because while "the state holds important interests in preventing voter fraud and upholding the integrity of election . . . . allowing voters to verify the validity of their ballots demonstratably advances—rather than hinders—these goals."

serves as a substantial, and irreparable, deprivation of his equal protection under law, this Court should grant Plaintiff's Motion because Plaintiff is likely to succeed on the merits of his equal protection claim.

> **C.   The combination of W.Va. Code § 3-5-23 and the COVID-19 pandemic also places a substantial burden on Plaintiff's First and Fourteenth Amendment Rights.**

While there is no fundamental right to seek public office, ballot access laws such as W.Va. Code § 3-5-23 are typically found to burden two types of fundamental rights—"the right of individuals to associate for the advancement of political beliefs, and the rights of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Whitfield v. Thurston,* --- F.Supp.3d ---, 2020 WL 3451692, at *9 (quoting *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). As has been acknowledged by Defendant Secretary of State, the COVID-19 pandemic—coupled with the in-person signature gathering process required by W.Va. Code § 3-5-23—places a "larger than typical burden" on independent candidates such as Plaintiff in their efforts to gain access to the General Election ballot. *See* Exhibit A. In fact, many states have similarly determined that the COVID-19 pandemic has a significant impact on the fundamental right to ballot access and have acted accordingly to ensure the First and Fourteenth Amendment rights of individuals to freedom of speech, freedom of association, equal protection, and due process of law are adequately protected. Plaintiff simply requests that this Court do the same through the issuance of a preliminary injunction.

In normal circumstances, the signature requirements provided for in W.Va. Code § 3-5-24 do not necessarily constitute a significant burden. However, a pandemic could hardly be considered normal circumstances. *See Faulkner v. Va. Dep't. of Elections,* CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020). (finding in the ballot access context that "circumstances as they exist…across

the United States are not normal right now").  That is why a number of courts have found that

existing signature requirements, including in-person or so-called "wet" signatures, for ballot access

pose a significant burden on the constitutional rights of individual candidates, necessitating a strict

scrutiny analysis of such ballot access restrictions. For instance, the Circuit Court of the City of

Richmond found in *Faulkner* that Virginia's 10,000 signature requirement for statewide candidates

seeking ballot access was a "significant" burden that precluded individuals from "freely

associating at the highest level with the political party of their choice."  *Id*.  Accordingly, the Court

found that Virginia's statute failed constitutional analysis under a strict scrutiny standard and

issued a preliminary injunction granting candidate's access to the ballot with 3,500 valid

signatures.  *See id*.  Similarly, the United States District Court for the Eastern District of Michigan

recently enjoined the "rigid application" of ballot access signature requirements in the case of

*Esshaki v. Whitmer,* --- F.Supp.3d ----, 2020 WL 1910154, at *10 (E.D. Mich. March 20, 2020).

The United States Court of Appeals for the Sixth Circuit agreed and chose "not to stay the part of

the preliminary injunction that prohibits enforcement of the ballot-access provisions of the

statute."[22]  *Esshaki v. Whitmer,* 813 Fed. Appx. 170, 172 (6th Cir. May 5, 2020).[23]  Likewise, the

Supreme Judicial Court of Massachusetts has found it to be "undisputed that, under the

circumstances arising from this pandemic, we should apply strict scrutiny to the minimum

signature requirements" necessary to obtain ballot access.  *Goldstein v. Secretary of the*

*Commonwealth,* 484 Mass. 516, 525 (2020); *see also Garbett v. Herbert*, --- F.Supp.3d ----, 2020

---

[22] In doing so, the Sixth Circuit instructed the State of Michigan "to select its own adjustments so as to reduce the burden on ballot access."  *Id.*

[23] While the Sixth Circuit has distinguished *Esshaki* from ballot signature challenges in Ohio, it is worth noting that each of these cases involved fact-specific challenges to ballot signature requirements in the midst of existing "Stay at Home" orders.  As the Sixth Circuit noted in *Hawkins v. Dewine,* the Court did "***not address [the] difficult question***" of whether "the state's application of the ballot-access requirements … is unconstitutional because it is unduly burdensome to require in-person signature collection during the COVID-19 pandemic."  *Hawkins v. Dewine*, No. 20-3717 (6th Cir. 2020) (emphasis added).  That is precisely the question raised by Plaintiff here.

WL 2064101, at *11 (D. Utah Apr. 29, 2020) (finding that the "severe" burden placed on plaintiff was the burden of having to gather signatures "in the midst of a pandemic when large public events have been canceled and the Governor has directed people to stay six feet apart and, preferably, to stay home").  In doing so, the Court provided "equitable relief intended to substantially diminish" the burden signature requirements have on the fundamental rights of would-be candidates.  *Id.* at 517.

Understanding the unquestionable burden the COVID-19 pandemic places on the signature gathering process, a number of states have taken Executive or Legislative action to alleviate the infringement upon individuals' First and Fourteenth Amendment rights.  For example, New York Governor Andrew Cuomo issued an executive order reducing petition signature requirements by 30%.[24]  Connecticut Governor Ned Lamont similarly issued an executive order reducing petition signature requirements by 30%.[25]  Meanwhile, other states, such as Vermont and Utah, have eliminated or significantly curtailed the enforcement of ballot access requirements for the duration of the pandemic.[26]  Other states have modified petition signature requirements in an effort to further reduce the impact of the COVID-19 pandemic has on the fundamental rights of potential candidates, with states such as New Jersey and Massachusetts eliminating in-person signature requirements similar to W.Va. Code § 3-5-23(c) and others such as Georgia extending the petitioning deadline.  *See generally* Exhibit A.   Accordingly, courts have taken such

---

[24] *See* N.Y. Exec. Order No. 202.2 (March 14, 2020)  https://www.governor.ny.gov/news/no-2022-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

[25] *See* Conn. Exec Order No. 7LL (May 11, 2020)  https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7LL.pdf?la=en.

[26] *See* H.681, Reg. Sess. (Vt. 2020) https://legislature.vermont.gov/Documents/2020/Docs/ACTS/ACT092/ACT092%20As%20Enacted.pdf; *see also* Utah Exec. Order No. 2020-8 (March 26, 2020) https://rules.utah.gov/wp-content/uploads/Utah-Executive-Order-No.-2020-8.pdf.

modifications into account, noting that plaintiffs' claims of severe burden have "much greater force" where a state has "failed to modify the election laws during this public health emergency." *Gottlieb v. Lamont,* --- F.Supp.3d ---, 2020 WL 3046205, at *6 (D. Conn. June 8, 2020); *see also Murray v. Cuomo,* No. 1:20-CV-03571-MKV, ---- F.Supp.3d ----, 2020 WL 2521449, at *10-13 (S.D. N.Y. May 18, 2020) (finding that state restrictions on ballot access were not severe "in light of all the changes that were made" to such laws in response to the pandemic).

   Clearly, the COVID-19 pandemic—coupled with the signature requirements of W.Va. Code § 3-5-23—places a significant burden on Plaintiff's ability to gain access to the ballot. Whether this Court applies strict scrutiny analysis, as has been done in many similar cases cited above, or intermediate scrutiny, as also provided for in the *Anderson-Burdick* framework, the result should be the same, as any justification for the burden put forth by Defendant is insufficient. Plaintiff has substantially complied with the provisions of W.Va. Code § 3-5-23. Allowing his access to the ballot will not result in any perceived overcrowding of the ballot as Plaintiff is the only independent candidate seeking access to the Presidential Election ballot by virtue of W.Va. Code § 3-5-23. Also, Plaintiff has clearly shown more than a "modicum of support" for his campaign by submitting significantly more than the minimum signature requirement of W.Va. Code § 3-5-23. The arbitrary and capricious signature validation process discussed in detail above, combined with the significant impacts that the COVID-19 pandemic has had on signature gathering generally, warrants the issuance of a preliminary injunction. In the weighing of burdens, the scales have been tipped far in excess against Defendant and in favor of Plaintiff and his right to access the ballot.

III.   **Absent this Court's issuance of a preliminary injunction, Plaintiff will undoubtedly suffer irreparable harm as Plaintiff will not appear on West Virginia's General Election ballot in 2020.**

In this case, it cannot be seriously questioned that Plaintiff, absent relief from this Court, will suffer irreparable harm because Plaintiff does not possess any other adequate remedy at law.  If this Court does not grant Plaintiff the relief sought through his Verified Complaint and Motion, then he will not appear on West Virginia's Presidential General Election ballot, and will be effectively precluded from engaging in the political process in the State of West Virginia—despite Plaintiff's substantial compliance with W.Va. Code § 3-5-23 in the midst of a global pandemic.  The arbitrary and capricious decision to not certify Plaintiff's name for the General Election ballot, without affording him with *any* procedural safeguards whatsoever, ultimately strips Plaintiff of his association rights under the First and Fourteenth Amendments.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that where plaintiff has proven a probability of success on the merits, the threatened loss of First Amendment freedoms "unquestionably constitutes irreparable injury.").  Obviously, "once the election occurs, there can be no do-over and no redress."  *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).  Nor is there any relief to Plaintiff otherwise for the violation of his constitutional rights. *See, e.g.*, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate.").  Conversely, Defendant Secretary of State suffers no irreparable harm for being enjoined from enforcing an unconstitutional statute.  *See Thompson v. Dewine,* 959 F.3d 804 (2020) (finding that enjoining a State from enforcing duly election laws constitutes irreparable harm to the State "*[u]nless the statute is unconstitutional*").  Accordingly, Plaintiff can affirmatively show irreparable harm and lack of adequate legal remedies in the absence of this Court granting the Motion.

IV.   **The public interest and balance of equities exceedingly favors this Court granting Plaintiff's Motion.**

As previously discussed herein, the public interest and balance of equities clearly favor this Court granting Plaintiff's Motion.  The public has an extremely compelling interest in elections in general and presidential elections in particular.  The public benefits when more candidates run for office that represent different interests and different parties.  Furthermore, Plaintiff has substantially complied with W.Va. Code § 3-5-23 and shown more than a modicum of support as is required by state law.  Despite Plaintiff's compliance with West Virginia's ballot access provisions, he has been denied access through the arbitrary and capricious manner in which the validity of signatures on his nomination certificates has been determined by unqualified laypersons.  Coupled with the increased burden that the COVID-19 pandemic places upon independent candidates seeking ballot access, the public interest favors the issuance of an injunction in the case at hand.  As stated above, over the last several months, states across the nation have taken numerous steps to ensure that election laws do not unduly burden the rights of independent candidates and voters alike.  Consequently, there has been a significant trend towards relaxing ballot access requirements and the implementation of procedural safeguards to ensure that signature validations comport with constitutional requirements.  To date, West Virginia has made no such accommodations.  Accordingly, the public interest and balance of equities clearly warrant the issuance of a preliminary injunction.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be granted, and this Court should enjoin Defendant from enforcing West Virginia Code § 3-5-23 against Plaintiff and order that Plaintiff and his running mate, Ms. Michelle Tidball, appear on the

2020 General Election Presidential ballot as independent candidates for President and Vice President, respectively.

Respectfully submitted,

*/s/ J. Mark Adkins*
J. Mark Adkins (WVSB # 7414)
Richard R. Heath, Jr. (WVSB # 9067)
Joshua A. Lanham (WVSB # 13218)
Unaiza R. Tyree (WVSB # 13253)
BOWLES RICE LLP
600 Quarrier Street (25301)
Charleston, West Virginia 25325-1386
Telephone: (304) 347-1100
Facsimile: (304) 347-1756
Email: madkins@bowlesrice.com

*Attorneys for Plaintiff, Kanye West*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

KANYE WEST**,**

   Plaintiff,

v.             CIVIL ACTION NO. 2:20-CV-00570

MAC WARNER, in his Official Capacity as
Secretary of State of West Virginia,

   Defendant.

### <u>CERTIFICATE OF SERVICE</u>

   I, J. Mark Adkins, hereby certify that the foregoing ***Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction*** has been served this **31st day of August, 2020**, via the CM/ECF system, upon the following counsel of record:

         <u>/s/ J. Mark Adkins     </u>
         J. Mark Adkins (WVSB #7414)

12135099.2