IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

KANYE WEST,

    Plaintiff,

v.              CIVIL ACTION NO. 2:20-cv-00570

MAC WARNER, *in his official capacity as*
*Secretary of State of West Virginia*,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Plaintiff's Motion for Preliminary Injunction* (Document 4), as well as the *Verified Complaint for Declaratory and Injunctive Relief* (Document 1), the *Defendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction* (Document 17), and the *Plaintiff's Reply in Support of Motion for Preliminary Injunction* (Document 20). The Plaintiff moves this Court for entry of a preliminary injunction against Defendant Mac Warner, the West Virginia Secretary of State, to prevent enforcement of West Virginia's ballot access law, W. Va. Code § 3-5-23, as applied to the Plaintiff, to allow him and his running mate, Ms. Michelle Tidball, to be placed on the ballot as independent candidates for President and Vice President in the 2020 General Election. For the reasons stated herein, the Court finds that the preliminary injunction should be denied.

**FACTUAL BACKGROUND**

The Plaintiff filed the complaint in this action on August 28, 2020, asserting a claim against the Defendant for violation of the right to freedom of speech and association, equal protection, and

due process as guaranteed by the First and Fourteenth Amendments and enforced by 42 U.S.C. § 1983. The Plaintiff is running for President of the United States as an independent candidate not affiliated with any major party. On August 3, 2020, the Plaintiff filed his West Virginia Statement of Candidacy for the 2020 General Election.

W. Va. Code §§ 3-5-23 and 3-5-24 set forth the procedure by which an unaffiliated candidate may have his or her name printed on a General Election ballot in West Virginia. To appear on the ballot, independent candidates must solicit signatures from duly qualified voters. The number of signatures obtained from registered voters must total at least one percent of the entire vote cast in the last preceding general election for President of the United States. In this case, the Plaintiff needed 7,144 signatures by the August 3, 2020 deadline to have his name placed on the ballot.

According to West Virginia law, each nomination certificate must be signed personally by the voter in their own handwriting. Each county clerk compares the signature petition pages to confirm that the voters are, in fact, registered to vote in the county and that the petition signatures match each voter's signature on file.

The Plaintiff's campaign obtained the credentials necessary to collect signatures in various counties across West Virginia. The Plaintiff submitted more than 14,000 signatures, or nomination certificates, to the West Virginia Secretary of State on the August 3, 2020 deadline, along with a corresponding Certificate of Announcement and filing fee. Approximately three weeks after the Plaintiff submitted his nomination certificates, he was notified by the Defendant that over 7,000 of his petition signatures had been invalidated by county clerks. As such,

according to the Defendant, the Plaintiff submitted only 6,383 valid petition signatures, leaving him 761 signatures short of the total number required to be placed on the ballot.

The Plaintiff's complaint asserts that he was left with no opportunity to challenge the invalidation of the submitted petition signatures. He alleges that W. Va. Code § 3-5-23 fails to provide any procedural safeguards that would allow a third-party candidate to challenge the various county clerks' counting and assessment of the validity of such signatures, and that the Defendant, acting under color of state law, enforced that law in violation of the Plaintiff's First and Fourteenth Amendment rights.

On August 31, 2020, the Plaintiff filed a motion for preliminary injunction. On September 8, 2020, the Defendant filed a response in opposition to the Plaintiff's motion for a preliminary injunction, and on September 9, 2020, the Plaintiff filed a reply. The matter is ripe for consideration.

## APPLICABLE LAW

As an initial matter, "preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs must satisfy all four requirements. *JAK Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015) (unpublished, per curiam opinion). Moreover, the public interest

may be considered alongside the balance of harm when the government is the party opposing an injunction. *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

The Plaintiff requests a preliminary injunction, seeking to enjoin the Defendant from enforcing West Virginia's ballot access law, codified in W. Va. Code § 3-5-23, resulting in the Plaintiff and his running mate being placed on the 2020 General Election presidential ballot. In support of his motion, the Plaintiff argues that West Virginia's ballot access law "lacks the necessary procedural safeguards required for the signature-matching requirements in order to avoid the immediate deprivation of Plaintiff's liberty interests." (Document 4 at 1.) The Plaintiff argues that under the current law, there is no chance to be heard or appeal the Defendant's decision regarding invalidation of submitted signatures, and that the combination of W. Va. Code § 3-5-23 and the coronavirus pandemic place substantial burdens on the Plaintiff's First and Fourteenth Amendment rights.

The Plaintiff further argues that "as absentee voting expands throughout the country in response to the ongoing COVID-19 pandemic, courts have begun to strike down so-called signature-matching laws that do not provide sufficient procedural safeguards, including, at a minimum, a sufficient notice period for alleged invalid signatures as well as a sufficient period of time to be heard and to 'cure' alleged invalidities." (Document 5 at 9.) The Plaintiff also argues that "[a] vast majority, if not all, of federal courts to recently consider nearly analogous issues of law and fact hold that a state's failure to provide adequate notice of allegedly deficient signatures coupled with an opportunity to be heard and 'cure' the allegedly deficient signatures constitutes a

prima facie showing of a constitutionally inadequate process for purposes of the Fourteenth Amendment's due process clause." (Document 5 at 11.)

In contrast, the Defendant argues that the Plaintiff is unlikely to prevail on the merits of his claims, because they are legally flawed and barred under the equitable doctrine of laches. According to the Defendant, the claims are barred because the delay in bringing this challenge to the constitutionality of W. Va. Code § 3-5-23 is unreasonable since the Plaintiff "was aware or should have been aware that he was subject to the challenged policies *at the moment he declared his candidacy*, not the moment that he failed to avoid application of those policies." (Document 17 at 6-7.) The Defendant further argues that the case law indicates that election rules should not be disrupted or changed as an election draws close, particularly by federal courts.

Moreover, the Defendant argues that the Plaintiff's late stage request to have his name printed on the ballot would severely disrupt the upcoming election and thereby cause harm to the State and its electorate. Specifically, the Defendant argues that granting the injunction would "cause the government significant hardship and would be detrimental to the public, would not permit sufficient time for county boards of ballot commissioners to prepare ballots for printing and meet the September 18, 2020 ballot mailing deadline, and would deprive the public of proper enforcement of West Virginia's election laws and potentially result in disparate treatment of other prospective candidates who did not satisfy the signature gathering and deadline requirements." (Document 17 at 4.)

## DISCUSSION

The Plaintiff's challenge to the signature-match requirement contained in the ballot access statute, W. Va. Code § 3-5-23, is "governed by the *Anderson-Burdick* framework, which balances

a state's asserted interest in regulating its elections against a plaintiff's voting, associational, and expressive rights under the First and Fourteenth Amendments." *Johnston v. Lamone*, 801 F. App'x 116, 119 (4th Cir. 2020) (citing *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983)). "Under that framework, the severity of the burden imposed dictates the level of justification required: [s]evere burdens trigger strict scrutiny, but if the burden is only modest, then a state's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (internal quotation marks omitted). Determining the severity of the burden imposed is primarily a legal question, which can be "resolved by reference to case law assessing similar challenges." *Id.* at 121.

Courts have upheld ballot access schemes which impose similar, or even more burdensome, requirements as the ballot access law in this case. See *Johnston*, 801 Fed. App'x at 121 (finding that Maryland's two-tier, 10,000 signature requirement for requalification of a political party passed as a modest burden that did not unconstitutionally burden party's access to ballot); *Pisano v. Strach*, 743 F.3d 927, 936 (4th Cir. 2014) (finding that a "modest" burden was imposed by North Carolina's requirement of 85,739 signatures—two percent of the total votes cast in the state's last general election—to be collected over a three-and-a-half-year period); *Swanson v. Worley*, 490 F.3d 894, 905-06 (11th Cir. 2007) (upholding Alabama's primary day filing deadline, in combination with a three percent signature requirement for unaffiliated candidates in local and statewide elections); *Lawrence v. Blackwell*, 430 F.3d 368, 370 (6th Cir. 2005) (upholding Ohio's primary eve filing deadline for unaffiliated congressional candidates, in combination with a one percent signature requirement).

There is "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Pisano*, 743 F.3d at 937 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). States have an interest in implementing procedures that ensure the orderly, fair, and efficient election of public officials. *Id.* "This interest necessarily requires the imposition of some cutoff period to verify the validity of signatures on the petition, to print ballots, and, if necessary, to litigate any challenges." *Id.* (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 787 (1974)).

The Plaintiff's primary argument centers on the process for invalidating signatures. States, however, have an important interest in verifying that voters are qualified and signature-match requirements have been previously upheld as legitimate. See *id.* (noting that states have an interest in verifying the validity of signatures on petitions); *Hess v. Hechler*, 925 F. Supp. 1140, 1142-43 (S.D. W. Va. 1995), *aff'd sub nom.*, *Fishbeck v. Hechler*, 85 F.3d 162 (4th Cir. 1996). Importantly, the Plaintiff's own lack of diligence contributed to his inability to meet the signature requirement in this case. Rather than submitting signatures early for review so that signatures could be supplemented as they were invalidated, the Plaintiff submitted all of his signatures on the absolute deadline for filing. As such, the Plaintiff left himself without adequate time to remedy invalidation and submit additional signatures to cure the deficit.

The statute plainly states that the Secretary of State or county clerks may investigate the validity of signatures. As such, the Plaintiff ultimately assumed the risk of having signatures invalidated by submitting the signatures on the last day. Where a lack of diligence is largely

responsible for failure of the candidate to meet the ballot access criteria, a plaintiff has "demonstrated only a slight burden, not a severe restriction that would require the state to narrowly draw its ballot access laws to advance a state interest of compelling importance." *Hess*, 925 F. Supp at 1152-53. Since the burden is modest, the State's important "interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot" is more than sufficient to overcome the Plaintiff's challenge in this case. *Pisano*, 743 F.3d at 937.

Next, the Court considers the balance of harms, taking into consideration the public interest since the government is the party opposing the preliminary injunction in this case. *Roe*, 947 F.3d at 230. The Plaintiff argues that "the exclusion of a legitimate candidate for office, particularly, for President of the United States, not only deprives the candidates of their rights, but also serves a grave harm to the citizens of the State, specifically, and to democracy, in general." (Document 20 at 14.) The Defendant asserts that granting the injunction at this stage would cause significant harm to both the government and the public, because it would not permit sufficient time for the county boards of ballot commissioners to print the ballots and mail them out on time.

The deadline for county clerks to start mailing absentee ballots in West Virginia is September 18, 2020, less than three weeks after the filing of the motion for preliminary injunction. Therefore, ballots are due to be mailed in a matter of *days*. At this late stage, there is almost no doubt that granting the preliminary injunction would delay timely delivery of the ballots since the ballots would have to be reprinted to include the Plaintiff and his running mate. On August 24, 2020, the Honorable Thomas E. Johnston, Chief Judge for the United States District Court for the Southern District of West Virginia, issued a bench ruling denying a similar preliminary injunction

in which a candidate wished to be placed on the ballot, finding that it had "become impractical and likely ineffectual in light of the rapidly approaching deadline for filing applications to vote by absentee ballot." *Wilson v. Justice et al.*, 2:20-cv-526, Document 16 at 61.

Because of the enormous burden posed by requiring the Plaintiff and his running mate to be printed on the ballot at this late stage, the Court finds the harm that would be inflicted on the government and the public at large if the injunction were granted is greater than the harm that would be inflicted on Plaintiff if the preliminary injunction were denied. The Plaintiff frames the harm to him as denial of ballot access due to lack of process to challenge signature disqualifications. However, the Plaintiff has not presented evidence suggesting that any of the signature disqualifications were actually improper and, as noted above, the Plaintiff could have remedied the harm by submitting signatures earlier. Therefore, the Court finds that balance of harms, giving consideration to the public interest, tips in favor of the Defendant in this case.

The Plaintiff further argues that Governor Justice's "Stay at Home Order" contributed to his inability to obtain the necessary number of signatures, and therefore, imposition of West Virginia's ballot access law is unconstitutional in light of the heightened burdens imposed by the coronavirus pandemic. The Plaintiff did not even begin his campaign, however, until months after the Governor's "Stay at Home Order" was lifted, and West Virginia does not impose an in-person signature requirement. Therefore, any alleged additional burdens imposed by the coronavirus pandemic and Governor Justice's "Stay at Home Order," and subsequent "Safer at Home Order," are not grounds for granting the injunction in this case. Indeed, the anticipated increase in absentee voting and associated public interest in ensuring timely printing of ballots weighs against disrupting the printing process, as requested by the Plaintiff.

Accordingly, the Court finds that the *Winters* factors do not weigh in favor of granting the preliminary injunction in this case.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Plaintiff's Motion for Preliminary Injunction* (Document 4) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: September 14, 2020

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA